UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

───────────────────────────────

YOLANDA RODRIGUEZ,

       Plaintiff,

   v.

BUFFALO MUNICIPAL HOUSING
AUTHORITY,

       Defendant.

───────────────────────────────

23-CV-87-LJV
DECISION & ORDER

On January 27, 2023, the plaintiff, Yolanda Rodriguez, commenced this action against the defendant, Buffalo Municipal Housing Authority ("BMHA"). Docket Item 1. Rodriguez alleged that BMHA discriminated against her because of her sex, race, and disability in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"); the Americans with Disabilities Act of 1990 ("ADA"); and the New York State Human Rights Law ("NYSHRL"). *Id.* She also alleged that BMHA retaliated against her in violation of the same statutes and subjected her to a hostile work environment. *Id.*

On April 17, 2023, BMHA moved to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6). Docket Item 9. Rodriguez requested an extension of time to respond to the motion to dismiss until May 31, 2023, Docket Item 10, which this Court granted, Docket Item 11. On the day the deadline expired, Rodriguez filed an amended complaint. Docket Item 12. Two weeks later, BMHA filed a second memorandum of law in support of its motion to dismiss. Docket Item 13. Rodriguez did not otherwise respond to BMHA's motion.

This Court then issued an order construing BMHA's motion to dismiss, Docket Item 9—supplemented by its subsequent brief, Docket Item 13—as applying to Rodriguez's amended complaint and giving Rodriguez another opportunity to respond. Docket Item 14.  After again seeking an extension of time, Docket Item 15, which this Court granted, Docket Item 16, Rodriguez responded, Docket Item 17.  Two weeks later, BMHA replied.  Docket Item 18.

For the reasons that follow, this Court grants BHMA's motion to dismiss with respect to Rodriguez's claims of sex discrimination (first cause of action), disability discrimination and retaliation (fifth and sixth causes of action), and retaliation based on familial status (seventh cause of action).  The Court denies BMHA's motion with respect to Rodriguez's claims of race discrimination (second cause of action), and hostile work environment based on race (third cause of action), and retaliation for opposing race discrimination (fourth cause of action).

### FACTUAL BACKGROUND[1]

Rodriguez "is an Afro-Latin female" who is the "single mother of a disabled adult son and a teenage daughter."  Docket Item 12 at ¶ 13.  BMHA hired Rodriguez on May 6, 2001.  *Id.* at ¶ 15.  She "began her employment . . . as a housing aide starting at the LaSalle Courts," but three days later BMHA "transferred [her] to Stuyvesant Apartments,

---

[1] Unless otherwise noted, the following facts are taken from the amended complaint, Docket Item 12.  On a motion to dismiss under Rule 12(b)(6), the Court "accept[s] all factual allegations as true and draw[s] all reasonable inferences in favor of the plaintiff."  *Trs. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 566 (2d Cir. 2016).

and then again transferred [her] to Lakeview Homes[,] where she spent the majority of her time as a housing aide." *Id*. at ¶ 16.

In 2002, Rodriguez "was appointed provisional Housing Manager." *Id*. at ¶ 18. She "became a permanent Housing Manager in 2012 after scoring the second highest on the civil service exam." *Id*.

BMHA employs six Housing Managers, three of whom "are Caucasian" and three of whom "are minorities." *Id*. at ¶ 19. Five of the six housing managers are female. *Id*. Each of the six housing managers is "responsible for [his or her] assigned locations" as part of one of six teams. *Id*.

Rodriguez "was assigned to Team 2 consisting of the Ferry Grider, Kelly Gardens, Kowal Apartments, LBJ apartments, Monsignor Geary apartments, and Schwab Terrace locations [sic]." *Id*. at ¶ 20. She "was responsible for 600 housing units." *Id*. Housing Manager "Paula Sebastian (Caucasian Female) managed 356" units, Housing Manager "Brian Burke (Caucasian Male) [managed] 418" units, and Housing Manager "Stephanie Masiello (Caucasian Female) [managed] 797" units. *Id*. at ¶ 33.

Masiello "was given preferential treatment by being allowed to dictate orders and control aspects of properties which were under the minority [m]anagers' supervision." *Id*. at ¶ 24. "Masiello was fully staffed with [four] aides and [one] typi[]st." *Id*. at ¶ 34. Rodriguez, "on the other hand, had only [four] aides on her team." *Id*. "Two of her aides were on FMLA, the other got injured and has been out, the fourth was a new hire." *Id*.

"Masiello's team was self-sufficient, leaving her to delegate tasks and allowing for her to have more time to receive better opportunities to grow within BMHA." *Id.* And "Tammy Van Wey, Director of Management, gave Masiello more one-on-one extensive meetings to provide her training to align [sic] Masiello to be more familiar and prepared to be promoted, [but] the other Housing Managers were not provided the same." *Id.* at ¶ 31.

Rodriguez complained about her work assignment. *Id.* at ¶ 35. "In retaliation, more work was assigned to her, despite the fact that her superiors knew she was a single mother and primary caregiver to her adult disabled son." *Id.* According to Rodriguez, "BMHA was trying to 'burn [her] out' . . . by overwhelming her with an abnormally large case load, and then trying to frame her as unfit to do her job." *Id.*

Additionally, Rodriguez says that minority managers were treated differently. For example, BHMA received "reports . . . that [Burke] had been refusing to visit his residents, as required," but did not hold him to this requirement. *Id.* at ¶ 36. Minority managers, by contrast, including Rodriguez, "were held to this requirement of seeing tenants and attending meetings with contractors." *Id.*

Rodriguez "found a lien on one of her personal properties placed there by a tenant of BMHA." *Id.* at ¶ 38. She notified BMHA's legal department, "who stated they w[ould] resolve the issue," but, contrary to BMHA's policy, they never did so. *Id.* In addition, Masiello "was able to get violent leasing violating tenants [sic] evicted," while Rodriguez and other minority managers were not, which "left [Rodriguez] in an even more dangerous position at work." *Id.* at ¶ 39.

4

On June 3, 2021, Rodriguez, Deleon, and Foster (the three minority mangers) complained about discrimination and disparate treatment to Executive Director Gilliam Brown.  *Id.* at ¶ 40.  Brown said that BMHA would "conduct small group diversity trainings," but no such trainings occurred.  *Id.* at ¶ 41.  During this meeting, Brown also said that neither "he nor BMHA had any plans to promote anyone to the position of Asset Manager."  *Id.* at ¶ 42.

But several months later, on October 14, 2021, BMHA posted the Asset Manager position.  *Id.* at ¶ 43.  Rodrigeuz, Deleon, and Foster all applied for the promotion.  *Id.* at ¶ 44.  BMHA promoted Masiello and Sebastian instead of any of the minority managers.  *Id.* at ¶ 45.

Meanwhile, "[o]n July 5, 2021, there was a fatal shooting at the Ferry Grider location while [Rodriguez] was on a scheduled vacation."  *Id.* at ¶ 53.  When Rodriguez "went to Ferry Grider" the next day, she "learned the victim was a 3[-]year[-]old child."  *Id.* at ¶ 55.  Due to this tragic incident and an "insensitive email sent to [Rodriguez] by the BMHA Legal Team on the day the [n]ews reported [the child's] death," Rodriguez "left the office in mental distress."  *Id.* at ¶ 57.

This "emotional disturbance" caused Rodrigeuz to become disabled.  *Id.* at ¶ 58.  On July 9, 2021, Rodriguez "was taken out of work per her doctor's orders."  *Id.* at ¶ 59.  And on August 17, 2021, Rodriguez "filed for Workers' Compensation due to the traumatic experience of a child['s having been] shot to death at a property she was managing and [Rodriguez's] feeling responsible for leasing the unit to the victim's mother."  *Id.* at ¶ 60.  The Workers Compensation Board found for Rodriguez on her claims, but that finding was reversed on appeal.  *Id.* at ¶¶ 66-67.

5

On December 10, 2021, Rodriguez received a phone call from Theresa Spagna at approximately 11:40 a.m. asking why Rodriguez had not arrived for an interview for the Asset Manager position.  *Id.* at ¶ 62.  Although other candidates had been notified about their interviews by email, BMHA notified Rodriguez only by regular mail.  *Id.*  The interview was ultimately rescheduled.  *Id.*

On June 30, 2022, Rodriguez's "doctor sent BMHA a request for accommodation for [Rodriguez] to work close to her place of residence and preferably in the senior development."  *Id.* at ¶ 68.  Brown responded that Rodriguez "would be transferred to Team 4."  *Id.* at ¶ 69.

Rodriguez returned from her medical leave on July 11, 2022.  *Id.* at ¶ 70.  She then "learned [that] BMHA had assigned her to work the same development that the mother of the deceased child was transferred to," which Rodriguez claims was a "deliberate act against [her]" that "caus[ed] major relapsing mental distress."  *Id.*

That same day, Rodriguez "learned [that] Masiello would be working out of the same office building as [Rodriguez] . . . as the Asset Manager at 110 Plum Street."  *Id.* at ¶ 71.  Masiello chose to work at the same location as Rodriguez, and she told Rodriguez, "I can work wherever I want."  *Id.*  "Despite [Rodriguez's] being told [that] Masiello ha[d] no supervisory authority over her, Masiello [proceeded] to send harassing, dismissive emails directed to [Rodriguez] and her direct staff."  *Id.* at ¶ 72.  Masiello also was "allowed to go through [Rodriguez]'s paperwork without any legitimate business-related reason[] for doing so."  *Id.*

Rodriguez also is "aware of several other minority employees[,] such as Alexis Hargro and Edwin Aponte, Jr., [who] made complaints of harassment against Masiello."

6

*Id.* at ¶ 73.  Rather than address those complaints, BMHA transferred both Hargro and Aponte "to Kenfield Langfield, the 'hardest development.'"  *Id.*

In the time since Rodriguez filed her complaint, "BMHA has promoted only Caucasian Managers to higher titles within the Management Team (Asset Managers and Director of Management)."  *Id.* at ¶ 74.  Meanwhile, "Burke, the only Caucasian Housing Manager, is once again assigned to the location with the least number of units, leaving all the newly promoted minority Housing Managers in the most dangerously known, highest-volume unit, most difficult developments [sic]."  *Id.*

Finally, on January 25, 2023, Rodriguez's staff discovered "a wooden carved out mammy with racial stereotypic language of 'Wipe yo feet honey chile' placed in the service garage at the 110 Blum Street location."  *Id.*

## <u>LEGAL PRINCIPLES</u>

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell. Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id.* (quoting *Twombly*, 550 U.S. at 556).[2]

---

[2] Relying on *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002), and *Boykin v. KeyCorp*, 521 F.3d 202 (2d Cir. 2008), Rodriguez asserts that "[t]he proper standard at the [m]otion to [d]ismiss stage is one of [f]air [n]otice."  *See* Docket Item 17 at 2-3, 11. As this Court advised Rodriguez's counsel several months before counsel filed her brief,

**DISCUSSION**

**I.   DISCRIMINATION CLAIMS**

To state a *prima facie* case of discrimination under Title VII, the plaintiff must

show "(1) that she is a member of a protected class; (2) that she was qualified for

employment in the position; (3) that she suffered an adverse employment action; and

[(4) that she has] some minimal evidence suggesting an inference that the employer

acted with discriminatory motivation."  *Littlejohn v. City of New York*, 795 F.3d 297, 307

(2d Cir. 2015).  If the plaintiff meets her burden, the defendant is presumed to have

unlawfully discriminated against her, and the burden shifts to the defendant to articulate

a legitimate, nondiscriminatory reason for the adverse employment action.  *Id.*  If the

defendant makes that showing, the burden shifts back to the plaintiff to show that the

defendant's stated reason is pretextual.  *Id.* at 307-08.

To defeat a motion to dismiss, a plaintiff alleging employment discrimination

"need only give plausible support to a minimal inference of discriminatory motivation"

behind an adverse employment action.  *Vega v. Hempstead Union Free Sch. Dist.*, 801

---

fair notice is not the proper standard for a motion to dismiss under Rule 12(b)(6).  *See
Sayers v. Niagara Falls City Sch. Dist.*, 2024 WL 356569, at *2 (W.D.N.Y. Jan. 31,
2024) (rejecting counsel's argument that "fair notice . . . is the actual legal standard to
test the sufficiency of a complaint"); *see also Mandala v. NTT Data, Inc.*, 975 F.3d 202,
208 (2d Cir. 2020) (explaining that in "*Iqbal*, [the Supreme Court] held that mere notice
pleading—the pleading standard underlying *Swierkiewicz*'s analysis—was inadequate,
and that '[t]o survive a motion to dismiss, a complaint must contain sufficient factual
matter, accepted as true, to state a claim to relief that is plausible on its face'" (quoting
*Iqbal*, 556 U.S. at 678)); *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 86-87
(2d Cir. 2015) (applying plausibility standard to motion to dismiss employment
discrimination claim).  Ignoring binding Second Circuit caselaw and this Court's clear
instruction, Rodriguez's counsel continues to argue for a fair notice standard.  As BMHA
observes, however, that standard applies only to *pro se* plaintiffs, not plaintiffs like
Rodriguez who have counsel.  *See* Docket Item 18 at 2-3.

F.3d 72, 84 (2d Cir. 2015); *Littlejohn*, 795 F.3d at 306, 311.  But "a discrimination

complaint . . . at a minimum [still must] assert nonconclusory factual matter sufficient to

nudge its claims across the line from conceivable to plausible to proceed."  *Dooley v.

JetBlue Airways Corp.*, 636 F. App'x 16, 20 (2d Cir. 2015) (summary order) (quoting

*EEOC v. Port Auth. of N.Y. & N.J.*, 768 F.3d 247, 254 (2d Cir. 2014)).  For example, a

court can infer discrimination from such circumstances as "the employer's criticism of

the plaintiff's performance in ethnically degrading terms; . . . its invidious comments

about others in the employee's protected group; . . . the more favorable treatment of

employees not in the protected group; or the sequence of events leading to the plaintiff's

discharge."  *Littlejohn*, 795 F.3d at 312 (quoting *Leibowitz v. Cornell Univ.*, 584 F.3d

487, 502 (2d Cir. 2009)).

### A.    Race

Rodrigeuz alleges that she and other minority managers at BMHA were treated

less favorably than white managers.  Among other things, Rodriguez alleges that two

white Housing Managers—Masiello and Sebastian—were promoted, while none of the

minority managers were.  *See* Docket Item 12 at ¶¶ 43-45.  Rodriguez further claims

that Masiello "was allowed to act as [Rodriguez]'s and other minority Housing

Managers' superior, although she was a peer."  Docket Item 17 at 8.  Additionally,

Rodrigeuz assets that "[b]oth Caucasian Housing Managers were assigned to [h]ousing

[l]ocations with fuller staff and they were given further training opportunities, which

afforded them qualifications for promotion, that [Rodrigeuz] and other [m]inority

[m]anagers did not obtain."  *Id.*  And Rodriguez alleges that she was assigned lower

levels of staffing than Masiello, *see* Docket Item 12 at ¶ 34, and that her complaints of

discrimination as well as those of other minority employees were ignored, *see id.* at ¶¶ 40-41.

These allegations, taken together, are sufficient to "give plausible support to a minimal inference of discriminatory motivation," and at this stage, no more is required. *See Vega*, 801 F.3d at 84; *Littlejohn*, 795 F.3d at 306, 311.  Whether those allegations pan out after discovery is a question for another day.[3]

### B.    Sex

Rodriguez's sex discrimination claim is a different story, however.  In her response to the motion to dismiss, Rodriguez says that she was discriminated against based on her sex because Burke, who is male, "has been treated more favorably than [her]."  Docket Item 17 at 7.  She also states that an "[i]nternal complaint of [s]ex discrimination was not investigated."  *Id.*

But in her amended complaint, Rodriguez alleges that "Burke has been treated more favorably than *the minority managers* as he had reports brought to [BMHA] that he had been refusing to visit his residents, as required."  Docket Item 12 at ¶ 36 (emphasis added).  According to the complaint, only "*[m]inority [m]anagers* including [Rodriguez]

---

[3] For example, BMHA argues that Masiello and Sebastian were not "similarly situated" to Rodriguez because Masiello and Sebastian "scored ten points higher than [Rodriguez] on the application rating scale."  Docket Item 18 at 6.  But those facts are not included in the amended complaint, and this Court therefore may not consider them on a motion to dismiss.  *See Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*, 602 F.3d 57, 64 (2d Cir. 2010) (explaining that on a motion to dismiss, "a district court may consider [only] 'the facts as asserted within the four corners of the complaint' together with 'the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference'" (quoting *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007))).

were held to this requirement of seeing tenants and attending meetings with contractors."  *Id.* (emphasis added).

What is more, as noted above, the bulk of the allegations in the complaint concern BMHA's advancing Masiello and Sebastian—white *women*—and treating them more favorably than minority employees, including Rodriguez.  As BMHA observes, "[t]he complaint provides no facts demonstrating how the promotion of two females discriminated against the female-plaintiff based on sex."  Docket Item 18 at 5.

Finally, Rodriguez says in response to the motion to dismiss that "Burke was assigned to the location with the least number of units."  Docket Item 17 at 7.  But that is not what the amended complaint says.  *See* Docket Item 12 at ¶ 33 (alleging that Burke managed 418 units, while Sebastian, a female, managed 356).

In sum, there are no allegations in the amended complaint that plausibly support Rodriguez's claim of sex discrimination.  Accordingly, BMHA's motion to dismiss is granted as to the first cause of action.

## II.   HOSTILE WORK ENVIRONMENT

"Under Title VII, an employee seeking to bring a hostile work environment claim must show [1] that she . . . is a member of a protected class; [2] that she suffered unwelcome harassment; [3] that she was harassed because of her membership in a protected class; and [4] that the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive work environment."[4]  *Monterroso v.*

---

[4] As Rodriguez correctly observes, a claim under the NYSHRL no longer "require[s] severe or pervasive conduct to constitute a hostile work environment claim." Docket Item 17 at 9.

11

*Sullivan & Cromwell, LLP*, 591 F. Supp. 2d 567, 584 (S.D.N.Y. 2008). "This test has objective and subjective elements: the misconduct shown must be 'severe or pervasive enough to create an objectively hostile or abusive work environment,' and the victim must also subjectively perceive that environment to be abusive." *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). Courts look at the totality of the circumstances and examine factors including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23.

Although "[t]he standard for a hostile work environment claim is a demanding one" and "Title VII is not intended to create a code of civility," *Scott v. Mem'l Sloan-Kettering Cancer Ctr.*, 190 F. Supp. 2d 590, 599 (S.D.N.Y. 2002), the Second Circuit "ha[s] repeatedly cautioned against setting the bar too high," *Terry v. Ashcroft*, 336 F.3d 128, 148 (2d Cir. 2003).

> "[W]hile a mild, isolated incident does not make a work environment hostile, the test is whether 'the harassment is of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse.'" The environment need not be "unendurable" or "intolerable." Nor must the victim's "psychological well-being" be damaged. In short, "'the fact that the law requires harassment to be severe or pervasive before it can be actionable does not mean that employers are free from liability in all but the most egregious cases.'"

*Id.* (citations and emphasis omitted).

"[A] court's task is to determine whether the acts about which an employee complains are part of the same actionable hostile work environment practice." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 120 (2002). The Second Circuit recently clarified that "[a] discrete discriminatory act, such as termination, within the

limitations period may not only support a claim for damages, it may also render a hostile work environment claim timely if it is shown to be part of the course of discriminatory conduct that underlies the hostile work environment claim." *King v. Aramark Servs. Inc.*, 96 F.4th 546, 561 (2d Cir. 2024) (emphasis omitted).

Here, Rodriguez says that she has established a hostile work environment based on her failure to be promoted, the "insensitive email" that was sent to her by the legal team, the "harassing emails" Masiello sent to Rodriguez and her staff, and the racist figurine that her staff found.  *See* Docket Item 12 at ¶¶ 57, 72, 74-75; Docket Item 17 at 9-10.  Rodriguez also notes that when other minority employees complained that they were harassed by Masiello, they were transferred to the "hardest development."  Docket Item 12 at ¶ 73.

Based on these allegations, Rodriguez has plausibly pleaded that she was subject to "harassment [that] was sufficiently severe or pervasive to alter the conditions of [her] employment," as is required for a federal hostile work environment claim.  *See Monterroso*, 591 F. Supp. 2d at 584.  Her hostile work environment claim based on race therefore may proceed.[5]

---

[5] The amended complaint does not specify whether Rodriguez bases her hostile work environment claim on sex as well as race.  *See* Docket Item 12 at ¶ 84-87.  And other than by stating in passing that Rodriguez was "target[ed] . . . as a minority female," the response to BMHA's motion to dismiss does not argue that the hostile work environment was based on sex.  *See* Docket Item 17 at 9-10.  Regardless, to the extent that Rodriguez alleges a hostile work environment based on sex, that claim is dismissed for the same reason that her sex discrimination claim is dismissed.  *See* Section I.B, *supra*.

III.    RETALIATION

To establish a *prima facie* case of retaliation under Title VII, "a plaintiff must

demonstrate that (1) she engaged in protected activity; (2) the employer was aware of

that activity; (3) the employee suffered a materially adverse action; and (4) there was a

causal connection between the protected activity and that adverse action."  *Kelly v.*

*Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*, 716 F.3d 10, 14 (2d Cir. 2013)

(citation and internal quotation marks omitted).

"'Protected activity' includes opposition to a discriminatory employment practice,"

*Hubbard v. Total Commc'ns., Inc.*, 347 F. App'x 679, 680-81 (2d Cir. 2009) (summary

order), and encompasses "informal protests" such as "making complaints to

management," *Belton v. Borg & Ide Imaging, P.C.*, 512 F. Supp. 3d 433, 445 (W.D.N.Y.

2021) (citation omitted).  "But such [informal] complaints must be sufficiently specific so

that the employer is put on notice that the plaintiff believes she is being discriminated

against on the basis of a protected characteristic."  *Id.* (alterations, citations, and internal

quotation marks omitted).  In other words, "[g]eneralized complaints" about

mistreatment are insufficient.  *McCullough v. John T. Mather Hosp. of Port Jefferson,*

*N.Y., Inc.*, 2019 WL 1755436, at *8 (E.D.N.Y. Apr. 19, 2019).  "To the extent that an

employee complains about perceived 'unfair' treatment relating to job responsibility,

hiring practices, or corporate policy, but fails to link the treatment to unlawful

discrimination or to h[er] protected status, [s]he fails to establish that [s]he was engaged

in [a] protected activity."  *Id.* (citation omitted).

Here, Rodriguez alleges that she and other minority managers complained about

discrimination to Executive Director Brown on June 3, 2021.  Docket Item 12 at ¶ 40.  At

that meeting, Brown told the minority mangers that there were no plans to promote

anyone to Asset Manager.  *Id.* at ¶ 42.  But a few months later, BMHA posted the Asset Manager position, and Masiello and Sebastian got the position over the three minority managers.  *Id.* at ¶¶ 43-45.  Moreover, Brown subsequently transferred the minority managers to less desirable locations.  *Id.* at ¶¶ 49-52.

Those facts plausibly allege retaliation, and BMHA's motion to dismiss is denied as to the fourth cause of action.

## IV.   DISABILITY DISCRIMINATION AND RETALIATION

Rodriguez "admits that [her disability discrimination] claim was raised for the first time in her [f]ederal complaint and, thus, that claim should be dismissed."  Docket Item 17 at 11.  Accordingly, BMHA's motion to dismiss is granted as to the fifth and sixth causes of action (discrimination and retaliation based on disability).

## V.   RETALIATION BASED ON FAMILIAL STATUS

In her response to the motion to dismiss, Rodriguez does not address her claim for retaliation based on familial status.  *See generally* Docket Item 17.  For that reason, this Court deems that claim to be abandoned.  *See Felix v. City of New York*, 344 F. Supp. 3d 644, 654-55 (S.D.N.Y. 2018) (explaining that "[c]ourts 'may, and generally will, deem a claim abandoned when a plaintiff fails to respond to a defendant's arguments that the claim should be dismissed'" (quoting *Arma v. Buyseasons, Inc.*, 591 F. Supp. 2d 637, 643 (S.D.N.Y. 2008))).

And regardless of whether Rodriguez intended to abandon that claim, there are no facts in the complaint that plausibly allege any retaliation based on familial status.  Rodriguez's seventh cause of action therefore is dismissed.

15

**<u>CONCLUSION</u>**

For the reasons stated above, this Court GRANTS IN PART and DENIES IN PART BMHA's motion to dismiss.  Docket Item 9.  More specifically, this Court GRANTS the motion with respect to the first, fifth, sixth, and seventh causes of action but DENIES it with respect to the second, third, and fourth causes of action.  BMHA shall answer the amended complaint within 21 days of the date of this decision and order.

SO ORDERED.

Dated:  August 19, 2024
          Buffalo, New York


                                             */s/ Lawrence J. Vilardo*
                                             LAWRENCE J. VILARDO
                                             UNITED STATES DISTRICT JUDGE